CHARLES T. RUSSELL et al., Appellants, *v.* SAMUEL M. ALLERTON, Respondent.

Where there is uncertainty or doubt as to the meaning of words or phrases used in a contract, in seeking for the intent of the parties as evidenced by the words used, the fact that a construction contended for would make the contract unreasonable and place one of the parties entirely at the mercy of the other, may properly be taken into consideration.

In July, 1878, plaintiffs, at Liverpool, chartered to defendant a steamer for the transportation of cattle from Philadelphia "to run regularly, commenc-ing at loading port on March 15 or not later than April 1, 1879."   It was provided by the charter-party that the cattle fittings were to be furnished

by plaintiffs, the charterer to approve the ventilation. In an action to recover damages for a breach of the contract, defendant's evidence was to the effect that he required the plaintiffs to furnish blowers for ventilation, and because of failure to do so refused to load the ship. The trial court charged that defendant was, under the contract, the sole judge of the proper kind of ventilation, and that if plaintiff was requested and refused to put in blowers there was an absolute breach of the contract. *Held*, error; that the clause in question did not confer upon defendant the right to refuse to load if all that could reasonably be required for ventilation was furnished, merely because he elected arbitrarily not to approve.

*It seems* in such case the evidence should be clear and convincing that the ship was properly and sufficiently ventilated; but it is not necessary to show that defendant's refusal to load was in actual bad faith.

Plaintiff's evidence showed that the steamer had four hatches of extra size, and in addition there were five iron ventilators in the hold and eight wind sails, and that such ventilation was extraordinary; that for ventilation the wind sails were greatly superior to blowers; that the latter would cost $500 each and were very rarely used on cattle ships for ventilation; also that at the time defendant refused to load, freight on cattle had gone down so much that plaintiffs could only get about three-fifths the sum agreed to be paid by defendant. *Held*, that the evidence was sufficient to require the submission to the jury of the question as to the unreasonableness of defendant's refusal to approve of the ventilation and to load the ship.

(Argued January 18, 1888; decided February 7, 1888.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made the 1st Monday of October, 1885, which affirmed a judgment in favor of defendant entered upon a verdict and affirmed an order denying a motion for a new trial.

This action was brought to recover damages for a breach of contract of freight entered into between the plaintiffs and the defendant, dated at Liverpool, July 23, 1878.

It was agreed between the plaintiffs, as sub-owners of the steamer Bertha, and the defendant, that the steamer should proceed to Philadelphia, and in the words of the contract, "ship to run regularly, commencing at loading port on March 15, 1879, or not later than April first and continuing up to July 15, 1879." She was to be loaded with live cattle, and it was provided by the charter-party that the cattle fittings were

to be furnished by the plaintiffs; " charterers to approve the ventilation." Defendant required plaintiffs to furnish blowers for ventilation, and on plaintiffs' refusal to furnish them, refused to load the ship.

The further material facts appear in the opinion.

*James L. Bishop* for appellants. The phrase " charterers to approve the ventilation," is open to construction, and the rights and obligations intended to be included in it are to be determined in the light of the purpose of the contract; the means of ventilation ordinarily employed in cattle ships, and the requirements of the " Bertha," as to the safety of the shipment having a reasonable regard to all the attending circumstances, including the interests both of the shipowner and the charterer. (*Burges* v. *Wickham*, 8 B. & S. 699; Carver on Carriage of Goods by Sea, §§ 179, 181; Jones on Construction of Contracts, § 89; *Ship Hound*, 27 Law Rep. 17 N. S. 34; *Blitz* v. *Union Steamboat Company*, 51 Mich. 558; *Block* v. *Bacheldor*, 120 Mass. 171; *Rogers* v. *Shearer*, 77 Me. 323; *Springstein* v. *Samson*, 32 N. Y. 703; *Blossom* v. *Griffen*, 13 id. 569; *Reynolds* v. *Commerce F. Ins.*, 47 id. 597; *Clark* v. *N. Y. L. Ins. & T. Co.*, 64 id. 33; *Koehler* v. *Adler*, 78 id. 287.) Upon the evidence the question whether the demand for blowers was one that was reasonable under the circumstances, that is, whether it was such a demand as was reasonably within the contemplation of the parties under this provision of the contract was for the jury. (*Stokes* v. *Johnson*, 57 N. Y. 673.) The approval of the ventilation being reserved to the defendant himself, he was the arbiter in his own case, and as such owed a duty to the plaintiffs from which he could not escape. (*Butler* v. *Tucker*, 23 Wend. 247, 249; *Hicks* v. *Whitmore*, 20 id. 548; *Mills* v. *Hunt*, 20 id. 431; *Whitman* v. *Mayor, etc.*, 21 Hun, 117; *Thomas* v. *Fleury*, 26 N. Y. 26, 33; *McMahon* v. *N. Y. & Erie R. R. Co.*, 20 id. 463, 467; *Bowery Nat. Bank* v. *Mayor, etc.*, 63 id. 336; *Voorhis* v. *Mayor, etc.*, 46 How. Pr. 116; *Smith* v. *Wright*, 4 Hun 652.)

*Ira D. Warren* for respondent. If, in the honest opinion of the respondent, based as it was, upon a report of the govern· ment inspector after a careful examination of the ship itself, blowers were essential to the proper ventilation of the ship, it was the duty of the appellants to supply them, although it might have been possible that blowers were, in fact, unneces- sary. (*McCrarren* v. *McNulty*, 7 Gray, 140; *Brown* v. *Foster*, 113 Mass. 138; *Zaleski* v. *Clark*, 44 Conn. 218; *Gray* v. *Central R. R. Co.*, 11 Hun, 70; *Grant* v. *Burch*, 26 id. 376; *Hoffman* v. *Gallaher*, 6 Daly, 42; *Gibson* v. *Cranage*, 39 Mich. 49; *Barlow* v. *Thompson*, 46 Ind. 386; *Moffatt* v. *Dickson*, 13 C. B. [76 E. C. L. R.] 543; *Barton* v. *Herman*, 11 Abb. 378; *McClure* v. *Boggs*, Vt. Sup. Ct., Feb. 20, 1886; *Burnett* v. *Hart*, 51 Am. Rep. 801, 805; *Huggins* v. *Fryer*, 1 Lans. 276; *Chadwick* v. *Lamb*, 29 Barb. 518; *Rich* v. *Milk*, 20 id. 616; *Tyler* v. *Ames*, 6 Lans. 280; *Andrews* v. *Belfred*, 2 C. B., N. S. [89 E. C. L. R.] 779; *Nelson* v. *Von Bounborst*, 29 Penn. St. 352; *Cass* v. *R. R. Co.*, 80 Penn. 31; *Lingerly* v. *Thayer*, 1 Cent. Rep. 52; 25 Am. L. R. [N. S ] 14, *note;* 52 Am. Rep. 158, *note.*) The custom or usage appealed to must, in order to be effectual for any purpose, be certain, uniform, reasonable, and the party against whom it is sought to be enforced must have notice of its existence, or it must be proved to have existed so long that he is presumed to have contracted with reference to it. (*Bradley* v. *Davis*, 63 Barb. 500; *Harris* v. *Trowbridge*, 83 N. Y. 93; *Sipperly* v. *Stewart*, 50 Barb. 62; *Smith* v. *Wright*, 1 Caines, 43; *Vail* v. *Rice*, 1 Seld. 159; *Wadsworth* v. *Alcott*, 2 id. 72; *Wheeler* v. *Newbold*, 16 N. Y. 392.) The appellants were in default in not being ready at the time they notified the respondent to have his cattle there. (*Hager* v. *Clark*, 78 N. Y. 52; *Weisser* v. *Maitland*, 3 Sandf. 318; Abb. on Shipping, 249, 250, 271; Dixon's Law of Shipping, 210, *note ;* 1 Parsons on Shipping, 310; 2 Parsons on Cont. [5th ed.] 660.) If, in terms, one waives his right under a contract, but receives no consider- ation for the waiver, and no steps have been taken under it, this mere license may be withdrawn at the pleasure of him

who gives it.   (Bishop on Cont., § 662; *Ripley* v. *Ætna Ins. Co.*, 30 N. Y. 163.)

PECKHAM, J.  We do not think that the effect of the words in the charter-party, "charterers to approve the ventilation," was to leave the subject of the ventilation of the ship to the absolute, unreasonable and wholly arbitrary decision of the charterer.   The agreement was entered into in England in July, 1878, and performance was not to be entered upon, at the earliest, until the middle of the following March, and plaintiffs were to send their ship over to Philadelphia to load. It can scarcely be regarded as credible that the owners of the vessel would place in the hands of the charterer the right to arbitrarily and without reason refuse to approve the ventilation of the ship.

To give the words in question the meaning attached to them by the courts below is to place the plaintiffs in a matter purely of business wholly at the mercy of others with whom they were contracting.  Could the plaintiffs have intended any such result, or could the defendant have expected such action on the part of the plaintiffs?  The plaintiffs were to be bound at all events, but by giving the meaning contended for by the defendant to the phrase in question he had at all times prior to the acceptance of the ship as properly ventilated, a means of escape from a contract which might by that time have become most unfavorable to him.   If the circumstances changed between July and the following March so that freights were materially less than the rate contracted for, and the plaintiffs sent their ship from England to receive the load, still a simple refusal to approve the ventilation would enable defendant to avoid the binding force of the contract, while if the rate materially advanced defendant could enforce the contract already made.   Parties have a right, of course, to make any contract they choose, so long as it is not illegal, but when the question arises as to what meaning is to be attached to words or phrases used in a contract, if there be any uncertainty or doubt concerning the same, considerations such as are above

mentioned are entirely legitimate and should not be lost sight of while endeavoring to learn the true meaning of the parties as evidenced by the terms used.

The learned judge submitted this case to the jury under an instruction that defendant was the sole judge under this contract of the proper kind of ventilation to be employed, and with his decision upon that point the plaintiffs herein had no right to complain. He also said that if the jury came to the conclusion upon the evidence that there was a positive refusal to put blowers in, that that ended the matter; that was an absolute, positive breach of the contract. The counsel for the plaintiffs requested the court to charge that the clause in question did not confer upon defendant the right to refuse to load arbitrarily, merely because he elected not to approve the ventilation, but was in the nature of a covenant on the part of the plaintiffs to do upon request whatever, considering the vessel and the carrying of live cattle, might reasonably be required to secure the ventilation of the vessel. This the learned judge refused and the plaintiffs duly excepted. The doctrine laid down in the charge is not in accord with that which has been announced by this court in several cases, the latest in February, 1886. (See *Duplex Safety Boiler Co.* v. *Garden*, 101 N. Y. 387, and cases cited in the opinion of DANFORTH, J.; also *Nolan* v. *Whitney*, 88 id. 648; *Bowery Nat. B'k* v. *Mayor*, etc., 63 id. 336.)

The defendant, however, claims that, even under the above rule, in this case there was no evidence, or at any rate not sufficient evidence to go to the jury upon the claim of plaintiffs, that the refusal of defendant to approve the ventilation was, in fact, unreasonable. We think there was evidence upon the subject in favor of plaintiffs' claim, which was enough to require its submission to the jury, and, if believed, to support a verdict for the plaintiffs. The plaintiffs proved that the ship had at this time four hatches; one forward of and another abaft the foremast, one abaft the mainmast and another on top of what was called the booby. The forehatch was twelve feet long and six to eight wide, and another was

twenty feet long and ten wide, while another was about as wide and the last was smaller but a good sized hatch; that the hatches were extra sized ones; that there were in addition five iron ventilators in the hold and eight wind sails. This evidence was substantially uncontradicted, and such ventilation, there was evidence to show, was extraordinary. The wind sails, it was claimed, were superior to blowers in ventilating the ship.

The defendant by his agent, demanded there should, in addition, be furnished blowers, probably a pair, which would cost $500 apiece. Upon the subject of the usefulness of these blowers for any purpose of ventilation, the plaintiffs gave considerable evidence, and some of their witnesses who were also men of considerable experience in the business, had never even heard of using blowers on a cattle ship for purposes of ventilation. One witness had been in the business of shipping cattle for eighteen years across the ocean, and had in that time shipped from 50,000 to 100,000, and was familiar with cattle ships, and out of from 300 to 400 ships he had seen blowers on but twice in his recollection. There was other evidence that the blowers were useless, did not act, and that wind sails were much better. One of defendant's own witnesses said he had never seen blowers on live cattle ships for ventilation, but he thought the Bertha was very poorly ventilated. The defendant also said himself, that he had made many shipments of cattle across the ocean, but did not know that any of the ships had blowers, except one from Boston. There was evidence also, that the defendant first stated as his reason for his refusal to load, that the ship was not ready when it ought to have been (this was April 7), and he did not then state as a reason his disapproval of the ventilation.

In regard to the motive for a refusal to approve the ventilation, and hence as bearing upon the real reason for defendant's objection and the reasonableness of his demand for blowers, there was evidence that soon after entering into the contract a privy council order was promulgated as to the

importation of cattle from America, and that soon thereafter the prices of American cattle went down, but whether on that account or not it could not be stated, and that at the time when the defendant refused to load freight on cattle had gone down largely and was depreciating continually, so that the best the plaintiffs could get was three, instead of five pounds per head.

There was other evidence on the general subject of ventilation and as to the value and propriety of blowers. I have not, however, thought it necessary to give the substance of all the evidence of the plaintiffs on the subject. On the part of the defendant there was evidence which it is also unnecessary to repeat, but which to some extent at least, contradicted that on the part of the plaintiffs, and the result of the whole testimony was to make it a question of fact for the jury to say whether the refusal to load was or was not under all the circumstances unreasonable. Upon such an issue the evidence that the refusal to load was unreasonable should be clear and convincing, or in other words it should be clearly made out to the entire satisfaction of the jury that the ship was properly and sufficiently ventilated for the purpose of carrying live cattle when the defendant refused to load. It would not be necessary, however, to go so far as to show that the defendant's refusal was in actual bad faith.

The judgment should be reversed and a new trial ordered, costs to abide the event.

All concur.

Judgment reversed.